(No. 6477.   December 17, 1937.)

THE PEOPLE OF THE STATE OF IDAHO, on the Relation of OSCAR A. HEARTBURG and ROY L. TRIPLETT, Suing for the Use and Benefit of Themselves, Respondents, v. INTERSTATE ENGINEERING AND CONSTRUCTION COMPANY, a Corporation; and UNITED STATES FIDELITY AND GUARANTY COMPANY, a Corporation, Appellants, and ROY L. TRIPLETT, Separate Appellant, v. INTERSTATE ENGINEERING AND CONSTRUCTION COMPANY, a Corporation; and UNITED STATES FIDELITY AND GUARANTY COMPANY, a Corporation, Separate Respondents.

[75 Pac. (2d) 997.]

458

Carl H. Swanstrom, for Appellants.

Wilbur L. Campbell, for Respondents and Separate Appellant.

460

GIVENS, J.—Appellant Interstate Engineering & Construction Company constructed a bridge across Salmon River on U.S.P.W.H.P. No. H.R.H. 9–1 (1935) and in connection therewith appellant and respondent Triplett cut, and respondent Heartburg furnished a tractor and driver for skidding, logs used in the false work on the bridge.

The company appealed from the portion of the judgment adverse to it in favor of Heartburg, and Triplett from the portion against him in favor of the company. For clarity and brevity we will refer to the company as appellants in both appeals and to Triplett and Heartburg simply by name.

Triplett contends he was employed as foreman at $15 per day and that on that basis there is due him $377.60, and under sec. 44–606, I. C. A., a penalty of $192. Heartburg claimed he was to receive $20 a day for his tractor, driver, oil and gas, and filed a lien on the logs delivered to protect his

claim of $446.65 and penalty of $600 under secs. 44–401 and 44–606, I. C. A. et seq., making a total of $1046.65.

Appellant defended against both causes of action on the assertion that Triplett was to receive, and the court found in accordance with appellant's contention—

" . . . . 7 cents per foot for round timbers, with 10 to 12 inch tops; 4 cents for those with 5 to 9 inch tops; for shorter lengths up to 60 feet, and for lengths up to 70 feet with 10 inch tops 8 cents; and for lengths up to 80 feet with 10 inch tops 9 cents; and for lengths up to 90 feet with 10 inch tops 10 cents; and for timbers 30 feet in length with 14 inch tops, 10 cents; . . . . the 4 cents (being) changed to five cents, all computations to be on the basis of lineal feet, . . . . "
voluntarily increased 50 per cent by appellant after the work started because Triplett complained he could not perform for the above amount; and that Triplett was overpaid on this basis $114.28.

The court found appellant did not hire or employ respondent Triplett as foreman or superintendent but that he was a sub-contractor. Appellant Triplett in his appeal ingeniously argues he could not have legally been a sub-contractor because the main contract between respondent company and the state provided in part as noted below:

"If any bidder shall state in his proposal the particular item or items of work which he proposes to sublet and shall name therein the subcontractor to whom he proposes to sublet such work in the event of an award to him, such item or items of work may be performed by such subcontractor notwithstanding the 80 per cent limitation above mentioned, provided that the subcontractor named in the proposal is a contractor of recognized standing, has a record of satisfactory performance, and the work proposed to be sublet does not constitute the major item or items of work embraced in the contract. Any bidder who shall name a subcontractor in his proposal shall attach thereto a certificate that the use of the name of such subcontractor was with his knowledge and consent. Any subcontractor so named in any bid may be required to submit questionnaires to establish his experience and financial ability. The naming of a subcontractor in any

such proposal will not insure approval of the proposed subletting of work to him, and in the event of disapproval of such subletting, the contractor shall perform such item or items of work with his own organization, in full compliance with all applicable terms of his contract.''

''SUBLETTING OR ASSIGNING THE CONTRACT:

''The contractor shall perform with his own organization and with the assistance of workmen under his immediate superintendence, work of a value not less than eighty (80) per cent of the value of all work embraced in the contract, exclusive of items not commonly found in contracts for similar work, or which require highly specialized knowledge, craftsmanship and/or equipment not ordinarily available in the organizations of contractors performing work of the character embraced in the contract.

''No portion of the contract shall be sublet, assigned or otherwise disposed of except with the written consent of the contracting officer or his authorized representative. Requests for permission to sublet, assign or otherwise dispose of any portion of the contract shall be in writing and accompanied by a showing that the organization which will perform the work is particularly experienced and equipped for such work. The contractor shall give assurance that the minimum wage for labor and the maximum amount to be deducted for board, if furnished, as stated in his proposal, shall apply to labor performed on all work sublet, assigned or otherwise disposed of in any way. Written consent to sublet, assign or otherwise dispose of any portion of the contract shall not be construed to relieve the contractor of any responsibility for the fulfillment of the contract.''

and that the evidence is not sufficient to show a sale under this provision of the contract:

''*Incidental or minor* quantities of material such as lumber, long lengths of reinforcing steel or other materials usually hauled with a type of vehicle not ordinarily available in a contractor's organization may be purchased on a job delivery basis and delivered to the work without regard to these provisions.''

and therefore, he was perforce an employee and his wages could not be less than specified in the contract, more than the schedule of payment asserted by appellant.

There is no evidence explaining the scope, meaning or application of these provisions of the contract and in the absence of such evidence, the burden being on Triplett to prove the application of these provisions of the contract as supporting his contention, the trial court may have justifiably concluded that since the total claims of Triplett and Heartburg, including the amounts paid them and sued for being $3,459.65, hence less than 20 per cent of the amount of the main contract, $68,605.75, there was no application of the provisions above noted because clearly more than 80 per cent of the contract was, so far as Triplett and Heartburg are concerned, performed by the respondent company.

Or the court may have concluded that since the contract or bid of respondent company, so far as the record shows, did not indicate any part was to be sub-contracted, the above provisions did not apply, in line with the reasoning in *In re Howell,* 27 Ida. 590, 150 Pac. 19, in that only after the contract was let did the company decide it necessary or advisable to get the timber by sub-contract and not directly, and since such work did not exceed 80 per cent of the total, there was no violation of the main contract. There is no showing that the cutting, skidding or delivery of logs used only in the false work and not as a permanent part of the structure of the bridge was of such a nature as was contemplated, or barred by the main contract from being sublet or contracted for.

The crucial point is what Triplett was to receive not what his exact status was. The rule so strenuously contended for by appellant Triplett that:

"If an agreement be so vague and indefinite that it is not possible to collect the full intent of the parties, it is void; for neither the Court nor the Jury can make an agreement for the parties."

must work both ways; and Triplett has not shown an agreement to pay him more than the amounts per lineal foot indicated on the delivery requisitions, Defendants' Exhibits A

to E, received, accepted and acted upon by appellant Triplett without protest as to their specification of the compensation to be paid him by the company, except his complaints to Sewell that he could not, or the timber could not be logged for the original amount, and the responsive 50 per cent increase of the compensation by Sewell.

The entire course of dealing between Triplett and appellant during the time the timber was being cut and delivered, including the payment of the men employed by Triplett, and the manner and method of working was more in line with that of the relation of sub-contractor than master and servant. Appellant exercised no control over what men Triplett employed or supervision of the way the work was done. Furthermore, Triplett's own testimony below refutes his present contended basis of employment and renders unnecessary and inapplicable any resort to inference to determine the amount he was to receive:

"Q. Well, what arrangement did he (Sewell) make?

"A. He made arrangements with me that I was to put that stuff out for so much a foot, see? And after we took out nine loads I went down and told Mr. Sewell I couldn't do it for that money; and he said; 'I never like to see a man work and lose money on a job'; and he said: 'You go ahead and get the timber out and I'll see that you come out on it.'

"Q. Well, did you sign up any written agreement or anything about the work?

"A. No, only just on them requisitions he gave me—orders for so much timber."

And while the evidence is conflicting as to just what the agreement between Triplett and appellant was, the evidence is sufficient to sustain the trial court's findings and conclusions in this regard, though perhaps more accurately stated the evidence in support of Triplett's contention is insufficient to overthrow the findings that Triplett was not engaged or employed as foreman, superintendent or laborer, and the conclusion that he was not entitled to recover herein because already paid in full, and hence, under the well known rule this portion of the judgment will be sustained. Neither party contended Triplett was a sub-contractor, and in view of sus-

taining the findings negativing any recovery by Triplett on any theory as urged and contended by him, it is unnecessary for us to decisively pass upon the propriety or responsiveness of the trial court's finding that he was a sub-contractor.

■ The court found appellant through Sewell, its manager, and through Triplett acting for the company, hired Heartburg's tractor on the basis as claimed by Heartburg and gave him judgment for $446.65 but no penalty; and Heartburg has not appealed from that portion of the judgment denying him the penalty, hence we need not consider the court's action in that regard.

Appellant argues it is inconsistent for the court to have found that Triplett was a sub-contractor of appellant and not foreman or employee, and yet that Triplett had authority to hire Heartburg and his tractor so as to bind appellant.

While the tractor was used in connection with the cutting and skidding of the logs by Triplett, it was not necessarily part of the same contract, and there is evidence that the skidding of the logs from where they were cut to where they were loaded on a truck, thence hauled to the bridge site (the trucking though done by Heartburg is not involved herein), was not a part of the arrangement between Triplett and appellant as to what work Triplett was to do and the responsive pay therefor. Triplett testified he told Sewell shortly after the work started he would have to hire a "cat" (caterpillar) tractor to skid the "stuff," (logs) and he told Sewell he had offered Heartburg $20 a day for the tractor, driver, gas and oil, and Sewell said: "That's mighty cheap," and the tractor was brought in and did the work. First a "20" which was too small and then a "30"; that Sewell, secretary-treasurer and manager of appellant, and Muehlethaler, president and superintendent of construction of appellant, inspected the work after the "cat" was put to work and found no fault with anything; that once when Triplett told Sewell he wanted more money Sewell said: "You go ahead and get that timber out, I never like to see a man work for me and lose money." Heartburg testified Sewell said he would guarantee the money for the tractor. Foresman, one of the workmen helping get out the logs, testified:

"Q. And will you state, as you remember, just what conversation passed between Mr. Sewell and Mr. Heartburg at that time?

"A. Well, Oscar was going to quit up there because he didn't know whether he was going to get any money for it or not, and Sewell told him to go ahead and that he would guarantee him his money.

"Q. That is what he told Mr. Heartburg?

"A. Yes."

Sewell testified:

"A. No, I didn't see him (Heartburg). The first that I knew about the deal outside of hearsay—some of the boys saying that he had a cat on the job—was that evening. Mr. Olson and Mr. Fellers, I believe, the cat-driver, came down there and said they were on their way to get another cat. Of course, naturally, I was interested in getting the logs out and asked them about the first cat and also about what they were going to get, and they told me that Carl Fuller expected to keep the hauling contract and wanted me to state whether they should go ahead with this cat. And I told them that Mr. Triplett was furnishing that material to us delivered at the bridge site and I had nothing whatever to do with his operations, and that so far as I knew Mr. Fuller was just an employee of Mr. Triplett's, and not a partner, because Mr. Triplett had represented to me that he was doing business solely for himself.

. . . . . . . . . . . . . .

"Q. After that on another occasion did Mr. Heartburg come down to you and inquire about how the account stood between you and Triplett?

"A. Yes.

"Q. At what time was that?

"A. Well, it's hard to tell, it was while we were erecting steel, so it must have been in October. I was standing on the old bridge watching the progress of the steel erection and Mr. Heartburg came there and visited with me and asked me how Triplett stood in his contract, whether he was drawn up in full for the amount of timber he had delivered and I

told him that he was pretty well drawn up, but that there was some balance remaining.

"Q. Did he ask for any at that time?

"A. He did not.

. . . . . . . . . . . . . .

"Q. And you knew what arrangement Mr. Triplett had made for the hiring of men and equipment to do this work, did you not, Mr. Sewell?

"A. In what way do you mean?

"Q. You knew he had hired a tractor?

"A. Yes sir.

"Q. At the rate of twenty dollars a day, did you not?

"A. Yes, I had been told that.

"Q. You knew also the day you made your so-called agreement with Mr. Triplett that he went that day to 'phone to Mr. Fuller and you have him charged with a 'phone call, don't you?

"A. Yes sir.

"Q. And you settled with Mr. Fuller, didn't you?

"A. No sir, not the first time. I settled with Mr. Triplett for everything up until about the 18th day of December, or I mean of September, and Mr. Triplett at that time came down there and started to tell me a lot of stuff, and about the same time some of the men who had been working up there complained they hadn't been paid, and after that time I determined I would only pay on written orders from Mr. Triplett.

. . . . . . . . . . . . . .

"Q. For those small items? The only bill that you turned down as a matter of fact was the claim of Oscar Heartburg, was it not, for tractor hire?

"A. Yes sir, I never received an order for that claim.

"Q. You never received an order. But did you turn it down, Mr. Sewell, because you didn't receive an order from Mr. Triplett?

"A. No, I understood that Mr. Triplett was dissatisfied with the operations of the tractor, and several of the other men had talked—fellows that had been employed there—about being dissatisfied with it, and Mr. Triplett didn't give

me an order, and I told Mr. Triplett and I told Mr. Heartburg that I was willing to go up to fifty per cent. over agreed prices but that we had to get these other bills in so that we could tell how much would be left for Mr. Heartburg and Mr. Triplett. I felt Mr. Triplett should have a little something out of it for himself besides his board, which he had received during the work, and these advances which he received.

. . . . . . . . . . . . . .

"Q. You heard the testimony of Mr. Heartburg and Mr. Foresman stating they talked to you about the 25th day of September and you stated that you would see they were paid for the tractor. You heard that testimony?

"A. Yes, I did.

"Q. Is that correct?

"A. No sir.

"Q. That isn't correct?

"A. No sir.

. . . . . . . . . . . . . .

"A. . . . . . Then Mr. Heartburg says: 'How about the "cat" rent'? And he had his figures and Mr. Triplett had his, and they were not just exactly in agreement, and I said: 'Well, you fellows get together; get your figures made up.' and then I turned to Triplett and said: 'You have some accounts too, don't you'? and he said 'Yes'; and I said: 'You bring in those other accounts and we will see just how you stand and I am prepared to go as far as fifty per cent. in excess of our agreed prices, because I appreciate the fact that you have got these timbers out and I don't want to see you go without any compensation.' And I told Mr. Heartburg, I says: 'I will get out to see you at Cottonwood, and I will lay my cards face up and we will see if we can't work a settlement out of this.' And Mr. Triplett came the next day I believe, and brought his other accounts down; and we saw that even raising fifty per cent. there wasn't going to be enough money to go around.''

Mr. Fellers who had worked prior to Heartburg, testified:

"Q. Now, you heard the testimony of Mr. Sewell last evening when he said that he talked with you just prior to your

going out to get the '30' cat he never made any agreement to guarantee the payment for the 'cat'. Is that correct?

"A. That is not."

Mr. Triplett further testified:

"Q. Now, with reference to the time Mr. Heartburg came there, how long was he there before you notified the Engineering and Construction Company?

"A. I notified them before Mr. Heartburg ever came. I told them I was going to hire a 'cat', and he wanted to know what wages I was going to pay, and I said: 'I'm going to pay him $20 a day and they furnish their man, gas and oil.'

"Q. And that is before you had seen Mr. Heartburg at all?

"A. No, I had called Mr. Heartburg up before that."

Mr. Olson testified:

"A. . . . . And I said: 'I will stop and see Sewell.' I took Mr. Fellers up to Heartburg's home. Well, I talked to Mr. Sewell and Sewell said: 'No, we will pay Heartburg for the hauling and not Fuller.'

"Q. Did Mr. Sewell say anything about the amount that was being paid for the use of the tractor at that time?

"A. Yes sir.

"Q. What did he say?

"A. He said he was getting it awful cheap.

"Q. And did he mention the price?

"A. Twenty dollars.

.   .   .   .   .   .   .   .   .   .   .   .

"Q. As a matter of fact, Mr. Olson, at the time you went down with Mr. Fellers to see Mr. Sewell about making some kind of an arrangement with Heartburg, didn't Mr. Sewell tell you that he had nothing to do with the arrangement—that it was Mr. Triplett's own business?

"A. No, he didn't. He said: 'I will guarantee; because I've got to get the timber down here; I will guarantee his money.' He said: 'It can't be done any cheaper, and I have nothing to do with Fuller.' "

Mr. Heartburg testified:

"Q. Now, do you remember approximately what day it was that you went down to see Mr. Sewell?

"A. Well, I think it was around the 25th or 26th; somewhere around there.

"Q. Around the 25th or 26th of September?

"A. Yes sir.

"Q. What conversation did you have with Mr. Sewell at that time?

"A. Well, I went down to see about the money for the hauling and the tractor, and he said he would guarantee the money for it.

"Q. Is that what he said?

"A. Yes.

"Q. And after that you continued with the work?

"A. Yes."

Thus while there is a conflict between Sewell and the other witnesses, and there is other evidence which indirectly bears upon this phase of the controversy the above is sufficient to show that there is substantial and adequate basis for the court's finding that Heartburg and his tractor had been specially hired in the first instance either by Triplett or Sewell, or both for appellant, and in effect later ratified by Sewell, which sustains the judgment in his favor.

The judgment is therefore *affirmed*. Heartburg's costs assessed against appellant Company. The cost of appellant Company's brief as respondent in Triplett's appeal assessed against Triplett. The cost of the transcript to be evenly divided between Triplett and appellant Company.

Morgan, C. J., and Holden, Ailshie, and Budge, JJ., concur.